| Fill in this information to identify the case: |
|---|
| Debtor 1    HAMPSTEAD GLOBAL, LLC |
| Debtor 2 (Spouse, if filing) |
| United States Bankruptcy Court for the: Southern District of New York |
| Case number   CH 11 19-22721(RDD) |

Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1: Identify the Claim

**1. Who is the current creditor?**
STACK'S-BOWERS NUMISMATICS, LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor  Stack's Bowers Galleries

**2. Has this claim been acquired from someone else?**
☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

c/o Teitelbaum Law Group LLC
Name

1 Barker Avenue
Number    Street

White Plains    NY    10601
City    State    ZIP Code

Contact phone  914 437 7670

Contact email  jteitelbaum@tblawllp.com

Where should payments to the creditor be sent? (if different)

Stack's Bowers Galleries
Name

1231 East Dyer Road    Suite 100
Number   Street

Santa Ana    CA    92705
City    State    ZIP Code

Contact phone  949 748 4800

Contact email  bkendrella@stacksbowers.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):
__ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4  Does this claim amend one already filed?**
☒ No
☐ Yes. Claim number on court claims registry (if known) _____   Filed on ___/___/_____ MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
☒ No
☐ Yes. Who made the earlier filing? _____

Official Form 410    Proof of Claim    page 1

### Part 2: Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**
☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?** $ 1,400,000.00. Does this amount include interest or other charges?
☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**
Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.
Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as health care information.

Executory Contract for Sale of Domain Name www.coins.com

**9. Is all or part of the claim secured?**
☑ No
☐ Yes. The claim is secured by a lien on property.

Nature of property:
☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☑ Other. Describe: Domain Name www.coins.com

Basis for perfection: _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $ _____
Amount of the claim that is secured: $ _____
Amount of the claim that is unsecured: $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $ _____

Annual Interest Rate (when case was filed) _____ %
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**
☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition. $ _____

**11. Is this claim subject to a right of setoff?**
☑ No
☐ Yes. Identify the property: _____

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br>☐ Yes. Check one: | Amount entitled to priority |
|---|---|---|
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ |

* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  06 / 07 / 2019

Signature: [signed]

Print the name of the person who is completing and signing this claim:

| Name | Brian Kendrella |
| --- | --- |
| | First name    Middle name    Last name |
| Title | President |
| Company | Stacks-Bowers |
| | Identify the corporate servicer as the company if the authorized agent is a servicer |
| Address | 1231 East Dyer Road Suite 100   Suite 100 |
| | Number   Street |
| | Santa Ana                    CA    92705 |
| | City                         State    ZIP Code |
| Contact phone | 949-748-4800    Email bkendrella@stacksbowers.com |

### PURCHASE AND SALE AGREEMENT FOR COINS.COM DOMAIN NAME

THIS PURCHASE AND SALE AGREEMENT (the "Agreement"), dated as of April 30, 2018 (the "Effective Date"), is made by and between STACK'S-BOWERS NUMISMATICS, LLC, a Delaware limited liability company with offices located at 1231 East Dyer Road, Suite 100, Santa Ana, California 92705 ("Seller") and HAMPSTEAD GLOBAL, LLC, a Delaware limited liability company with offices located at 2811 Colorado Avenue, Unit #1, Santa Monica, California ("Buyer").

WHEREAS, Seller is the owner of all right, title and interest to and in connection with the domain name www.coins.com (together, the "Domain Name");

WHEREAS Buyer wishes to purchase the Domain Name from Seller, and Seller wishes to sell the Domain Name to Buyer, in accordance with the terms set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Purchase and Sale. Seller hereby sells and Buyer hereby purchases the Domain Name, and all rights and interests of any kind associated therewith and arising therefrom, including but not limited to all intellectual property rights, and all trademark rights, to the extent such rights exist, in accordance with the terms and conditions set forth in this Agreement.

2. Purchase Price: The total purchase price for the Domain Name is One Million Seven Hundred Thousand Dollars ($1,700,000.00) (the "Purchase Price"). Buyer shall pay the Purchase Price to Seller as follows:

    a. Five (5) business days after the Effective Date, Buyer shall pay Seller the sum of Three Hundred Thousand Dollars ($300,000.00) in immediately available funds (the "Initial Payment"). Upon receipt of the Initial Payment, and in accordance with section 3, Seller shall transfer the registration of the Domain Name (as well as all Intellectual Property rights associated with the Domain Name) to the Escrow Holder and make the Escrow Holder the registrant of the Domain Name to hold the Domain Name by private registration, in trust and as custodian, in accordance with the terms and conditions of this Agreement and the Escrow Agreement (as defined below and attached hereto as Exhibit A). Should the Buyer fail to pay the Initial Payment to Seller five (5) business days after

1



the Effective Date, time being of the essence, this Agreement and the Buyer's right to purchase the Domain Name shall automatically terminate.

b. The balance of Purchase Price, One Million Four Hundred Thousand Dollars ($1,400,000.00), shall be paid in immediately available funds as follows: (i) Three Hundred Thousand Dollars ($300,000) ten (10) months from the Effective Date; (ii) Two Hundred Thousand Dollars ($200,000) thirteen (13) months from the Effective Date; (iii) Three Hundred Thousand Dollars ($300,000) sixteen (16) months from the Effective Date; and (iii) Six Hundred Thousand Dollars ($600,000) twenty-five (25) months from the Effective Date.

c. At the sole election of Buyer, Buyer may satisfy the entire Purchase Price under this Section 2, by paying a total of One Million Six Hundred Thousand Dollars ($1,600,000), less any amounts previously paid toward the Purchase Price up until that time, no later than twelve (12) months from the Effective Date. If Buyer makes such payment by such time, the Purchase Price shall be deemed paid in full and satisfied and the Escrow Holder shall promptly transfer the registration of the Domain Name (as well as all Intellectual Property rights associated with the Domain Name) to Buyer.

For or the avoidance of doubt, the party's agree that whatever day of the month the Effective Date falls upon (for example May 14th) then this day of the month (i.e. the 14th) shall serve as the anniversary date for all future payment dates. For example, if the Effective Date is May 15, 2018, the six (6) months from the Effective Date shall be November 15, 2018.

3. Escrow Holding and Transfer of Domain Name: Buyer and Seller will open an escrow account on or before the Effective Date with a mutually agreed upon escrow company experienced in the transfer and holding of domain names (the "Escrow Holder"). The Escrow Holder will manage and maintain the registration of the Domain Name and all rights associated with the Domain Name (including Intellectual Property rights), by private registration, according to this Agreement, and the associated Escrow Agreement ("Escrow Agreement"), a copy of which is attached hereto and made a part hereof as Exhibit A. The Escrow Agreement will be executed on or before the Effective Date. In the event there is any conflict with this Agreement and the Escrow Agreement, this Agreement shall govern and control. The party's hereby agree to direct the Escrow Holder to follow this Agreement in the event of any conflict or confusion. Within five (5) business days of its receipt of the Initial payment, Seller shall transfer the registration of the Domain Name (as well

2



as all Intellectual Property rights associated with the Domain Name) by private registration to the Escrow Holder's registrar account, in trust, to be held by the Escrow Holder in accordance with the terms and conditions of the Escrow Agreement. The Escrow Holder shall be required to use a proxy service to protect the public disclosure of the registrant of the domain name (such as Domains by Proxy), and also subject to the terms and conditions of the Escrow Agreement attached hereto. For the avoidance of doubt, the Escrow Holder shall hold by private registration, the registration of the Domain Name (as well as all Intellectual Property rights associated with the Domain Name): (i) in trust for the benefit of Buyer; (ii) to secure Sellers receipt of the unpaid balance of the Purchase Price in full in accordance with Section 2, and (iii) Buyer shall not receive the any ownership interest in the Domain Name until the Purchase Price has been paid in full and the registration has been transferred to Buyer. Subject to the Buyer completing payment of the Purchase Price in full in accordance with Section 2 hereof, the Escrow Holder shall upon such payment in full of the Purchase Price immediately transfer the registration of the Domain Name (as well as all Intellectual Property rights associated with the Domain Name) to the Buyer, or any party or entity the Buyer directs, time being of the essence. The Escrow Holder shall be required to, and be instructed by both Buyer and Seller to, comply with Buyer's rights to use the Domain Name in accordance with Section 4 below, as well as to comply with and facilitate any assignment pursuant to Section 14 below, time being of the essence. For the avoidance of doubt, only upon the payment in full of the Purchase Price in accordance with Section 2, will the registration of the Domain Name (as well as all Intellectual Property rights associated with the Domain Name) be transferred to and registered in the name of the Buyer, concurrently, by such action, all right, title and interest of any kind associated with the Domain Name, including but not limited to all intellectual property rights, and all trademark rights, to the extent such rights exist, shall automatically pass to the Buyer.

4. <u>DNS Pointing and Hosting</u>: Within ten (10) business days of transferring the registration of the Domain Name to the Escrow Holder, the Seller shall change or will instruct the Escrow Holder to change the Domain Name Server ("DNS") of the Domain Name to a DNS selected by Buyer (the "DNS Pointing") and thereafter, during the Term of the Escrow Agreement, Buyer shall have the limited use rights of the DNS, and all hosting to the Domain Name, as described in Section 5 below.

5. <u>Use of Domain Name while in Escrow/Terms of Use</u>: Subject to the restrictions set forth in this Section 5, Buyer may use the Domain Name while it is registered in the name of the Escrow Holder, so long as no uncured Event of Default has occurred, to do the following:

3



    a. Hosting content on the Domain Name and associated with the Domain Name concerning the blockchain and cryptocurrency industry, in a manner designed to preserve or increase, and not to diminish, the value of the Domain Name;

    b. Directing the Domain Name to the website(s) and/or web page(s) of Buyer's choosing concerning the blockchain and cryptocurrency industry, in a manner designed to preserve or increase, and not to diminish, the value of the Domain Name;

    c. Using the Domain Name in connection with one or more email addresses;

    d. Use the Domain Name in compliance with all applicable laws and regulations; and

    e. Use the Domain Name with regard to all marketing related efforts in connection with items a and b above.

Notwithstanding the foregoing, Buyer covenants and agrees not to directly or indirectly do any of the following until the Purchase Price has been paid in full: (i) use the Domain Name in a manner other than set forth above; (ii) permit or authorize any lien, claim or encumbrance on the Domain Name; or (iii) Utilize the Domain Name for any unlawful purpose or anything of pornographic nature.

Buyer shall use its best efforts not to employ any technique to drive traffic to the Domain Name that would violate Google's standards for traffic generation.

6. **Mutual Representations**: Each party represents and warrants to the other party that:

    a. it is duly organized, validly existing, and in good standing as a corporation, LLC or other entity as represented herein under the laws of its jurisdiction of incorporation or organization;

    b. it has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder;

    c. the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary action of the party; and

    d. when executed and delivered by such party, this Agreement will constitute the legal, valid, and binding obligation of such party, enforceable against such party in accordance with its terms.

7. **Parties' Individual Representations and Warranties**:

    a. Seller's Representations and Warranties:

4



    i. Seller has, and shall maintain for all purposes required herein, good and marketable title to the registration of the Domain Name (as well as all Intellectual Property rights associated with the Domain Name) and all its associated rights, title and interest as well as all IP free and clear of all liens and encumbrances of any nature;

    ii. Seller shall deliver to Buyer and the Escrow Holder all instruments and documents required on Seller's part to effectuate the Closing and the transactions contemplated hereby in form and substance consistent with the requirements herein and approved by Buyer;

    iii. Upon transfer of the registration of the Domain Name to the Escrow Holder, the Escrow Holder will be holding the registration of the Domain Name (as well as all Intellectual Property rights associated with the Domain Name), in accordance with the terms and conditions of the Escrow Agreement. For the avoidance of doubt, except for the use rights described in Section 5, the Buyer shall have no ownership or other interest in the Domain Name until the Purchase Price is paid in full.

    iv. There are no existing threatened claims or proceedings by any third party relating to the Domain Name. The Domain Name is not subject to any lien, security interest, mortgage or other encumbrance. Seller has not granted any license(s) to or authorized any third parties to use the Domain Name or any confusingly similar Domain Name. The Domain Name is not subject to any outstanding order, decree, judgment, stipulation, written restriction, undertaking, or agreement that would prevent Seller form complying with any of its obligations under this Sale Agreement.

    v. Upon the transfer of the registration of the Domain Name (as well as all Intellectual Property rights associated with the Domain Name) from the Escrow Holder to the Buyer, all right, title and interest associated with the Domain Name shall reside with the Buyer, and none of the same will reside with the Seller or the Escrow Holder.

b. Buyer's Representations and Warranties:

    i. Buyer shall deliver to Seller and the Escrow Holder all instruments and documents required on Buyer's part to effectuate the Closing and the transactions

5



        contemplated hereby in form and substance consistent with the requirements herein and approved by Seller; and

    ii. Buyer is prepared to pay the Initial Payment in immediately available funds by the date indicted herein.

8. **Entire Agreement**: This Agreement, including the attached Escrow Agreement (as an exhibit hereto), constitutes the sole and entire agreement of the parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter. The parties also waive any and all reliance or inducement claims of any kind. To the extent there is any conflict between this Agreement and the Escrow Agreement, the parties agree that this Agreement shall control and supersede, and the parties agree to instruct the Escrow Holder to follow the instructions under this Agreement.

9. **Exclusivity Period**: Effective March 5, 2018 the Seller agreed not to (directly or through its agents) discuss, negotiate with, or enter into an agreement with, any third party for the sale of the Domain Name for a period of thirty (30) business days (the "Exclusivity Period"). The Exclusivity Period is ongoing unless the Agreement is formally terminated.

10. **Costs**: Buyer shall pay the cost of any escrow fees incurred in connection with the Escrow. Buyer and Seller shall each be responsible for the fees and expenses of its own attorneys and accountants and any other costs associated with this transaction.

11. **Brokers**: Seller and Buyer represent to each other that there are no brokers involved with the sale of the Domain Name. Seller and Buyer shall mutually indemnify each other as to claims by any agents with whom the indemnifying party may have dealt with relative to the transaction contemplated herein.

12. **Events of Default**: An event of default shall mean Buyer's failure to timely make any of the payments on the scheduled date's as described in Section 2, or utilizes the Domain Name in violation of the restrictions set forth in Section 5 ("Event of Default"). Upon the occurrence of an Event of Default, Seller may issue a formal written notice of default providing the Buyer an opportunity to cure within ten (10) business days following a written notice of default ("Notice of Default"). If an Event of Default is not cured within the applicable cure period after the Notice of Default, at the option of the Seller, this Agreement shall terminate upon notice to the Buyer and the Escrow Holder, and upon such notice, the Escrow Holder, at the sole direction of the Seller, shall transfer and re-register the Domain Name to an account in the name of the Seller and any



of the Purchase Price payments made by Buyer to Seller will be retained by Seller as liquidated damages and as compensation for Buyer's use of the Domain Name up to the date of termination. If Seller chooses to accept the liquidation damages under the agreement, no other remedies may be sought for breach of any failure to render payment. For the avoidance of doubt, any payments made after their scheduled date under Section 2, but prior to the end of the ten (10) business days cure period shall be deemed timely. If Seller, based on Seller's good-faith judgment that an Event of Default has occurred, issues a notice of default to Buyer arising from Buyer's use of the Domain Name in purported violation of the restrictions set forth in Section 5, Seller shall in its notice identify the exact content to which it objects, and provide Buyer with at least three (3) business days to replace or revise that content and submit it to Seller for approval, which approval shall not be unreasonably withheld or delayed. Upon Seller's approval, the Event of Default shall be deemed cured. In the event that Buyer and Seller are unable to come to an agreement regarding the replacement or revision of any particular content, Buyer's prompt removal of the content to which Seller objects shall be deemed a cure of the Event of Default. If, subsequently, Seller, based on Seller's good-faith judgment that another Event of Default has occurred, issues another notice of default to Buyer arising from Buyer's use of the Domain Name in purported violation of the restrictions set forth in Section 5, Seller shall either proceed in the manner set forth above regarding prior notices of default in purported violation of the restrictions set forth in Section 5, or notify Buyer that it may not use the Domain Name to host content or direct the Domain Name to the website(s) and/or web page(s) of Buyer's choosing until the Purchase Price has been paid in full and Buyer shall upon receipt of such notice, immediately cease using the domain name until the Purchase Price has been paid in full. Under no circumstances may Seller terminate this Agreement for purported violation of the restrictions set forth in Section 5, and under all circumstances the remedy for such violation shall be Buyer's loss of the right to use the Domain Name to host content or direct the Domain Name to the website(s) and/or web page(s) of Buyer's choosing until the Purchase Price has been paid in full. For the avoidance of doubt, the period of three (3) business days referenced above for Buyer to submit proposed revisions to Seller shall not shorten the period of ten (10) business days provided to Buyer to cure all purported Events of Default.

13. Confidentiality: The parties agree that the terms of this Agreement, but not its existence, are confidential (the "Confidential Information"), and agree that they will not disclose any Confidential Information other than (i) to their respective employees, representatives, managers,

7



officers, directors, attorneys, consultants, lenders, investors and accountants that shall be obligated to maintain the confidentiality of the Confidential Information, (2) as may be required by law (including tax reporting) or by a court of law, and (3) to the extent such information is in the public domain or becomes a part of the public domain. Buyer and Seller will direct their representatives to comply with the terms of this paragraph. Seller agrees to keep any and all information relating to the Buyer, including but not limited to Buyer's identity, confidential.

14. Assignment: The Buyer may assign its rights and obligations under this Agreement, after the payment of the Initial Payment, without the prior written consent of the Seller, provided that: (i) an Event of Default has not occurred; (ii) the Buyer gives the Seller no less than five (5) business days prior written notice of any such assignment, including a copy of the form of the assignment; and (iii) the assignee agrees to be bound by the terms and conditions of this Agreement and the Escrow Agreement. In the event of an assignment, the assignee shall be responsible for all remaining payment obligations under this Agreement, including but not limited to the obligation to make any remaining payments of the Purchase Price to Seller. Notwithstanding the foregoing, Buyer shall not be released of its obligations under this Agreement as a result of any such assignment. The Escrow Holder shall also accept and comply with any assignment under this Section 14. Seller agrees to cooperate in order to facilitate any such assignment (including but not limited to instructing the Escrow Holder to abide by the assignment), time being of the essence.

15. Governing Law, Venue and Validity: If any provision of this Agreement is held to be void, invalid or inoperative, such event shall not affect any other provisions herein, which shall continue and remain in full force and effect as though such void, invalid or inoperative provision had not been a part hereof. The parties agree that the laws of the State of California shall govern the interpretation and enforcement of this Agreement, without giving effect to that state's choice of law rules. The parties hereto submit themselves to the jurisdiction of the courts of the state of California for the purposes of the enforcement of this Agreement, and agree that the venue of any action to enforce any term, condition, or provision of this agreement, or related to this Agreement shall be the County of Los Angeles, California. Both parties waive their rights to change or challenge venue. The prevailing party in any action under this Agreement shall be entitled to reasonable attorneys' fees and costs. The geographic extent of this Agreement shall not be limited to the United States.

16. Indemnification:

    a. Mutual Indemnification. Each party (an "Indemnifying Party") shall indemnify, defend,

8



and hold harmless the other party and its officers, directors, employees, agents, affiliates, successors, assigns, and licensees (each, an "Indemnified Party") from and against any losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers, arising out of or in connection with any third-party claim, suit, action, or proceeding (each a "Third-Party Claim" aside from an Assignee under this Agreement) relating to any actual or alleged breach by the Indemnifying Party of its representations, warranties, covenants, or other obligations hereunder.

b. Indemnification Procedure. The Indemnified Party shall notify the Indemnifying Party upon becoming aware of a Third-Party Claim under this Section 16. The Indemnifying party shall promptly assume control of the defense and investigation of such Third-Party Claim, with counsel reasonably acceptable to the Indemnified Party, and the Indemnified Party shall reasonably cooperate with the Indemnifying Party in connection therewith, in each case at the Indemnified Party's sole cost and expense. The Indemnified Party may participate in the defense of such Third-Party Claim, with counsel of its own choosing and at its own cost and expense. The Indemnifying Party shall not settle any such Third-Party Claim without such Indemnified Party's prior written consent. If the Indemnifying Party fails or refuses to assume control of the defense of such Third-Party Claim, the Indemnified Party has the right, but no obligation, to defend against such Third-Party Claim, including settling such Third-Party Claim after giving notice to the Indemnifying Party, in each case in such manner and on such terms as the Indemnified Party may deem appropriate. Neither the Indemnified Party's failure to perform any obligation under this Section 15.b. nor any Indemnified Party's act or omission in the defense or settlement of any such Third-Party Claim will relieve the Indemnifying Party of its obligations under this Section 15.b., except to the extent that the Indemnifying Party can demonstrate that it has been materially prejudiced as a result thereof.

17. Notices: Any notice in connection with this Agreement will be in writing (includes an electronic writing) and will be delivered by hand, by a recognized overnight carrier, or by email to the party due to receive the notice and such party's counsel at the information indicated in this section as follows or to any such other address as shall be advised by any party to other party by Notice. Notices shall be effective as of the date of receipt.

9



If to Seller:

> Stack's-Bowers International, LLC
> 1231 East Dyer Road, Suite 100
> Santa Ana, California 92705
> Attention: Brian Kendrella, President
> BKendrella@StacksBowers.com

With a copy to:

> Douglas J. Frye, Esq.
> 24955 Pacific Coast Highway, Suite A201
> Malibu, California 90265
> doug@douglasfryelaw.com

If to Buyer:

> Hampstead Global, LLC
> 2811 Colorado Ave Unit #1
> Santa Monica, CA 90404
> Hampstead99@gmail.com

With a copy to:

> Hillel I. Parness, Esq.
> PARNESS LAW FIRM, PLLC
> 136 Madison Ave., 6th Floor
> New York, New York 10016
> hip@hiplaw.com

18. **Relationship of the Parties**: This relationship between the parties is that of independent contractors. Nothing contained in this Agreement will be construed as creating any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the parties, and neither party has authority to contract for or bind the other party in any manner whatsoever.

19. **Successors and Assigns**: This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

20. **Counterparts**: This Agreement may be executed in any number of counterparts, each of which when executed shall be deemed an original; such counterparts shall together constitute but one agreement, and shall not be effective until each party has executed at least one counterpart. Each counterpart may be delivered by portable data format (PDF), which transmission shall be deemed delivery of an originally executed document.

10




21. <u>No Third Party Beneficiaries</u>: There are no person(s) intended as third party beneficiaries of this Agreement, and no person or entity (other than the parties) to this Agreement will have any right to enforce any term of this Agreement unless assigned as per the terms of this Agreement.

22. <u>Waiver, Amendment, Modification or Cancellation</u>: This Agreement may only be amended, modified, superseded, or canceled, and the terms and conditions hereof may only be waived, by a written instrument, including email, signed by the parties hereto or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right hereunder, nor any single or partial exercise of any rights hereunder, preclude any other or further exercise thereof or the exercise of any other right hereunder.

23. <u>Mutual Cooperation</u>: Seller and Buyer shall execute such other documents and take such further actions as may be reasonably required to effectuate the terms, rights and conditions of this Agreement, or to effectuate an assignment of this Agreement in accordance with Section 14, time being of the essence.

*SIGNED ON THE FOLLOWING PAGE*

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first set forth above.

**STACK'S-BOWERS NUMISMATICS, LLC.**      **HAMPSTEAD GLOBAL, LLC**

_[signature]_                              _[signature]_

Signature                                  Signature

BRIAN KENDRELLA                            Adam Perzow

Printed Name                               Printed Name

PRESIDENT                                  Owner / Manager

Title                                      Title

4/30/18                                    April 30, 2018

11



Date
4/30/18

Date
April 30, 2018

12

