KIRBY AISNER & CURLEY LLP             Hearing Date: August 9, 2019
*Attorneys for the Debtor*             Hearing Time: 10:00 a.m.
700 Post Road, Ste. 237
Scarsdale, New York 10583
(914) 401-9500
Erica R. Aisner, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:                                      Chapter 11
                                            Case No. 19-22721 (rdd)
HAMPSTEAD GLOBAL, LLC,


               Debtor
--------------------------------------------------------x

**OPPOSITION TO STACK'S – BOWERS NUMISMATICS, LLC'S MOTION SEEKING (I) TO COVERT TO A CHAPTER 7 OR DISMISS THE CHAPTER 11 CASE, (II) COMPELLING ASSUMPTION OR REJECTION OF EXECUTORY CONTRACT; AND (III) MODIFYING THE AUTOMATIC STAY**

  Hampstead Global, LLC, the above-captioned debtor and debtor-in-possession, by its counsel Kirby Aisner & Curley LLP, as and for its Opposition to the motion (the "Motion") of Stack's-Bowers Numismatics, LLC ("Stacks") seeking (i) conversion to Chapter 7 or dismissal of the Chapter 11 case, (ii) compelling assumption or rejection of executory contract and (iii) modifying the automatic stay to permit the exercise of remedies of assumed or rejected contracts, respectfully sets forth as follows:

  1.  Stacks' Motion should be denied because it has not, and cannot, satisfy its burden, by a preponderance of evidence, that "cause" exists to dismiss or convert this Chapter 11 case. This case is only in its nascent stages and the Debtor deserves the opportunity to propose a plan of reorganization before the rug is pulled out from under it with the drastic remedy of conversion or dismissal. In addition, the underlying agreement between the Debtor and Stacks' is not executory

1

as the only ongoing material obligation is payment of money by the Debtor to Stacks and the formality of the transfer of the domain registration by the escrow agent/ trustee to the Debtor. As such, the provisions of Section 365 of the Bankruptcy Code requiring assumption or rejection do not apply. Finally, there are no grounds for the granting of stay relief.

2.   The Debtor filed this case in a good faith in order to preserve its valuable assets and avoid a forfeiture to Stacks of the Debtor's most valuable asset, which would not be in the best interests of the estate, its creditors and interest holders. In fact, were this Court to grant the Motion, Stacks will reap a windfall as it will have cleared a path to regain title of the *coins.com* domain from the escrow agent/ trustee, which is worth far more than the amount of its claim, but it will also retain the money already paid by the Debtor under the Purchase and Sale Agreement.

## I.   BACKGROUND

3.   On March 30, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").

4.   The Debtor has continued in possession of its property and the management of its business affairs as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5.   No trustee, examiner or statutory committee has been heretofore appointed in this proceeding.

6.   Debtor is in the business of developing two digital platforms: an international currency exchange operating in various international markets utilizing the *coins.com* domain name and brand, as well as an exchange which allows for "fractional" investments in rare assets utilizing the *rarex.com* domain name.

2

**A. The Debtor's Business – Currently Being Developed**

7. The concept behind *coins.com* as a premiere digital assets brokerage and platform was conceived in late 2017 during the rise of the bitcoin and digital currency which was followed by the acquisition of the domain name in early 2018 from Stacks. Stacks had previously been using the domain name for traditional rare coin sales. The Debtor's business plan is to create *coins.com* branded digital currency brokerages around the world but not suffering through the laboring oar and expense of creating jurisdictionally compliant operations and infrastructure through the creation and development of partnerships and joint ventures in each jurisdiction with already established players who want to unify under one global brand, "coins.com". For example, *coins.com* South Africa would be a joint venture between a local South African digital asset brokerage and the Debtor, whereby the Debtor would have a licensing and profit participation in that jurisidction's activities. The line of business relies mainly on the infrastructure of the local partner and leverages highly on the brand awareness and marketing which will be handled at the Debtor's level through its management team, currently being assembled in both the United States and Singapore, which has become the recognized "hub" of digital currency.

8. The *rarex.com* concept has been in development since 2017 and in late 2018 the Debtor fully acquired the entirety of the Rarex business and concept. The Debtor is currently working with a well-recognized and regarded technology industry executive with the specialized skills and expertise to continue developing this platform. The Rarex business involves the sale of digital fractional interests in rare assets (art, jewelry, rare coins, etc.) – such that anyone can own a small investment in a piece of art or a rare coin. This platform utilizes blockchain technology and is likely to be highly synergistic with *coins.com*.

9. In fact, in or about mid 2018, the Debtor, A-Mark, an affiliate of Stacks run by the

3

same principal and representatives from Stacks, met on several occasions in which the potential of a **joint venture.** It is the Debtor's belief that during these meetings, Stacks' learned the true potential value for both the Rarex concept (which could greatly improve their rare coins and metals business), as well as also having fully learned the full value of the *coins.com* domain (in terms of its value when being used for digital currency and bitcoin industry), as opposed to its use under Stacks' ownership when it was being used for traditional old coins, and now, perhaps suffering from a bit of sellers' remorse having learned the domain has a much higher value when used for digital currency, seeks to recover the asset for it is own benefit at a complete loss to the Debtor and its creditors and interest holder.

10.     The Debtor's principal has been hard at work creating strategic relationships and seeking to raise the capital needed to launch the *coins.com* platform (in fact the Debtor has lined up $400,000 conditioned on plan approval or other settlement from this chapter 11). To that end he has, and continues to, travel around the world meeting with potential investors, developers and joint venture candidates including having spent months in Singapore with an executive who has agreed to head up the *coins.com* operations in that part of the world. Together, they have already made great strides including the establishment of a working relationship with potential partners in Kuala Lumpur, Hong Kong, Japan and Philippines. Furthermore, the Debtor has another individual in Los Angeles leading US operations vis-à-vis *coins.com* and Rarex.

   B.  **The Reason for the Chapter 11 Case**

11.     As is all too often the case, the Debtor's efforts to transition its business from the development stage forward have taken longer than expected and hoped. This can be attributed to a number of circumstances both within and outside of the Debtor's control. For one, the unexpected crypto "winter" that took place from the Summer of 2018 until March of 2019 drastically reduced

the available capital being invested in the industry as compared to the year leading up to that point. Fortunately, the Debtor believes that things are turning around and the industry has winds at its back again.

12. Regardless of the cause, the result was that the Debtor was unable to remit the second payment due under the Purchase and Sale Agreement (the "PSA") with Stacks.

13. Upon this realization, the Debtor's principal reached out to Stacks in order to request the additional time needed to make the required payments. These efforts were unfortunately unsuccessful. The Debtor suspects that this flat rejection was motivated by more than simply an unwillingness to renegotiate but rather by "sellers' remorse."

14. Faced with the likelihood of the forfeiture of its most valuable asset, as well as the capital already paid to Stacks, the Debtor was left with no choice but to file this Chapter 11 to protect itself.

C. **The Debtor's Intentions in Chapter 11**

15. The Debtor is currently in the process of finalizing terms for a Plan of Reorganization which affords it the time necessary to put the final pieces into place for its business, including additional funding and key partnerships.

16. The Plan, which the Debtor hopes to have filed prior to the return date of the Motion, will provide for the escrow of funds on confirmation to pay interest to its creditors during the next eighteen (18) month period after which time the Debtor will either be in a position to pay off the balance due to all creditors or it will consent to a marketing and sale process whereby the *coins.com* domain name is marketed and sold, with the proceeds going to pay the creditors of the estate in full with the balance used to launch the *rarex.com* platform and continue to deploy its business plan.

5

17. The Debtor has consulted with a number of leading industry domain name experts with respect to the value of the *coins.com* domain name and has received opinion as to valuations on the asset. These experts include Sedo, a well-recognized broker in the domain name industry, as well as a valuation from the trustee who currently holds the domain for the benefit of Debtor, Stevan Lieberman, (who also presided and was involved in the negotiation of an offer the Debtor received for over $5 million from a Nasdaq listed public company).

18. Based upon these consultations, the domain has been estimated to be worth a minimum of $5 million, assuming it is sold in a "firesale" to an end user (an entity that could use the domain for their business). On the other hand, if a more formalized and thoughtful process is undertaken, the value could be as much as four (4) times that amount, and specifically if it is sold as and to a digital assets company, and not as a rare physical coin domain. As such, the creditors of the estate would be adequately secured during the period between the effective date of a Chapter 11 Plan and the ultimate distribution to creditors.

## II.   CAUSE DOES NOT EXIST TO DISMISS THE CHAPTER 11 CASE

19. The Debtor filed for chapter 11 relief with the good faith intention to use the bankruptcy process to preserve its assets and prevent a forfeiture to Stacks due to the Debtor's inability to fund the most recent payment due under the PSA. In doing so, the Debtor will be able to pay its creditors, including Stacks, 100% of the money owed while being afforded the time necessary to position its business lines in a strategically optimized light so as to move forward with strength as opposed to weakness (taking in 3rd party capital under duress or sub-optimal conditions).

20. A motion seeking to dismiss a chapter 11 proceeding is determined under §1112(b) of the Bankruptcy Code, which states in pertinent part,

(b) (1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 [11 USCS §§ 701 et seq.] or dismiss a case under this chapter [11 USCS §§ 1101 et seq.], whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) [11 USCS § 1104(a)] of a trustee or an examiner is in the best interests of creditors and the estate.

21. Bankruptcy Code §1112(b)(4) sets forth a non-exhaustive list of "cause" supporting dismissal of a case and Stacks argues that "cause" exists under subsection (A) of Section 1112(b)(4) of the Bankruptcy Code which requires a showing of "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."

22. In support of the relief sought, Stacks alleges that the Debtor has no business and no assets (other than the domain name) and is incurring expenses which it cannot pay. (Motion, p. 10-11). These allegations are inaccurate

23. The Debtor is a company which owns and/or has significant rights in intellectual property which is still in the development stage. However, the lack of business operations does not in and of itself constitute cause. See *RCM Global Long Term Capital Appreciation Fund, Ltd.,* 200 B.R. 514 (S.D.N.Y. 1996). Further, given the Debtor's status, its expenses are minimal and are being paid by the Debtor's principal personally and therefore the Debtor is not suffering continuing losses. Finally, the Debtor has rights to a valuable asset sitting in a trust for the benefit of Debtor which is more than sufficient to pay all creditors in full and fund the launch of its remaining assets, should its efforts to finance the launch its full intended business platform prove unsuccessful or untimely (as such deadlines would be set by the Debtor's Plan).

24. Notably absent from §1112(b)(4) is "bad faith" as a basis for dismissal however, it is widely recognized under judicial doctrine as a basis for dismissal. *See In re C-TC 9th Ave,* 113 F. 3d 1304 (2d Cir. 1997). Under *C-TC* and its progeny, "grounds for dismissal exist if it is clear

7

on the filing date that "there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings." *In re General Growth Properties, Inc.* 409 B.R. 43, 56 (S.D.N.Y. 2009) *citing In re C-TC 9th Ave.* at 1309-10. To that end, the well settled standard in the Second Circuit is that "*both* objective futility of the reorganization process and subjective bad faith in the filing of the petition are found." *Id.* citing *In re Kingston Square Assocs.,* 214 B.R. 713, 725 (S.D.N.Y. 1997).

25. Courts are cautioned to dismiss petitions for lack of good faith "only sparingly and with great caution." *General Growth* at 56, citing *Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989); See also *In re 300 Washington Street LLC,* 528 B.R. 534 (E.D.N.Y. 2015)(dismissal for bad faith should be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances); *In re RCM Global* at 520 citing 5 *L. King, Collier on Bankruptcy*, ¶1112.03 at 1112-36 (15th ed. 1995)("a court should reach the conclusion that there is no demonstrable ability to reorganize only upon the strongest evidentiary showing").In fact, the Court in *Carolin* cautioned that,

> if the only question raised is whether a reorganization is realistically possible, *i.e.,* if there is no questioned the petitioner's subjective good faith in filing, threshold dismissal of a petition is not warranted. In those circumstances the question of ultimate futility is better left to post-petition developments…it is better to risk proceeding with a wrongly motivated invocation of chapter11 protections whose futility is not immediately manifest that to risk cutting off even a remote chance that a reorganization effort so motivated might nevertheless yield a successful rehabilitation.

*Carolin* at 700-701.

26. Stacks' identifies eight (8) of the *C-TC* factors as its basis to dismiss the Chapter 11 case (Motion, p. 12-13). While the Debtor adamantly disputes the presence of these factors, "[e]ven if all or nearly all of the C-TC factors are arguably present, a debtor may still establish that it has the ability to effectively reorganize." *In re 300 Washington Street LLC,* 528 B.R. at 551; See

8

also *In re Artisanal 2015, LLC,* 2017 WL 5125545 (S.D.N.Y. 2017) (denying motion to dismiss where the debtor had a chance to reorganize, even where bad faith factors were present). Regardless, that is hardly the case here. While the Debtor admits that it presently has no cash flow and no employees the remaining factors cited by Stacks are simply untrue.

   a. ***Stacks alleges that the Debtor has only one asset. --*** Untrue. The Debtor owns both *coins.com* and *rarex.com* together with all of the intellectual property and intangible rights that run with those assets.

   b. ***Stacks alleges that the Debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors.*** – Untrue. The Debtor's Schedules of Assets and Liabilities lists $20,000 in secured creditors as compared to approximately $1.75 million in general unsecured creditors comprised of eighteen (18) creditors.

   c. ***Stacks alleges that the Debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt.*** – Untrue. There is more than one asset and there is no foreclosure action pending. To the contrary, absent this Chapter 11 filing, Stacks would have been in a position to file a notice of default triggering a cure period and with the Debtor unable at that time to cure the monetary default, simply recover the domain name without any formal proceeding.

   d. ***Stacks alleges that the Debtor's financial condition is, in essence, a two-party dispute between the debtor and secured creditors which can be resolved in the state foreclosure proceeding.*** – Untrue. Again, there is no state court foreclosure proceeding and the PSA is structured in such a way that eliminates the need for such a process. Moreover, while it is true that the Debtor has significant legal claims against Stacks which will be adjudicated in short order, that is not the crux of this case. At the heart of this case is a Debtor who simply ran out of time to raise the capital needed to satisfy its largest creditor thereby putting its most valuable asset is jeopardy.

   e. ***Stacks alleges that the timing of the Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the Debtor's secured creditors to enforce their rights.*** –Untrue. The Debtor submits that it is in fact the opposite. When the Debtor realized that it was not going to be able to make the next installment payment timely, attempts were made to negotiate with Stacks and only when those efforts were unsuccessful, was the Chapter 11 filed.

   f. ***The Debtor can't meet current expenses.*** – Untrue. The Debtor's principal is funding the minimal ongoing expenses while the digital currency market is no only rebounding but growing and becoming more and more of a mainstream asset class.

9

27.     As the movant, Stacks bears the burden of proof by a preponderance of the evidence. *In re GEL, LLC,* 495 B.R. 240, 245 (E.D.N.Y. 2012). Based upon the dual standard discussed above, Stacks has failed to satisfy its burden that the Debtor's efforts to reorganize are futile or that its intention was anything other than to protects its assets while gaining breathing room from its largest creditor in order to reorganize – and in this case unlike so many other Chapter 11 cases, to pay its creditors <u>in full</u>.

28.     Finally, though Stacks argues for dismissal not conversion, the Debtor notes that a Chapter 7 would result in no better recovery for the creditors than in Chapter 11 (and likely less), which the Debtor proposes will be 100%. On the other hand, a Chapter 7 could potentially recover less total value to the estate as the Debtor is in the best position to maximize the value of the asset, which directly impacts the net proceeds in the event of a liquidation which would be used to launch the rarex.com platform and/ or provide a return to the equity holder. It is also worthy of note that Stacks advocates for dismissal, which results in its own recovery of the domain name to liquidate and reap the benefits alone, as opposed to a Chapter 7 where even with a reduced recovery, the net proceeds would be returned to the estate and its interest holder upon payment of creditors in full. The Debtor submits that this is further evidence of Stacks true intentions which is to reap a windfall on the asset that it sold for a price it now realizes was well below market.

29.     Based upon the foregoing, cause does not exist to justify dismissal or conversion of this Chapter 11 case.

### III.     THE PSA IS NOT AN EXECUTORY AGREEMENT CAPABLE OF BEING ASSUMED OR REJECTED

10

30. The PSA does not qualify as an executory contract pursuant to Section 365 of the Bankruptcy Code and therefore Stacks attempts to compel assumption, and thus cure, or rejection, must be denied.

31. While the Bankruptcy Code does not define the term "executory contract", it is widely accepted that the critical factor is the performance which remains due on each side of the contract. *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513 n.6 (1984) (quoting the legislative history H.R.Rep. No. 95-595, p. 347 (1977) and S.Rep. No. 95-989, p. 58 (1977); *In re Penn Traffic Co.*, 524 F.3d 373, 379 (2d Cir. 2008). However, the inquiry does not end there as there must be an examination of how much performance must be outstanding for the contract to be treated as executory – and the clear answer is that it must be "substantial." *Id.* at 379, citing Verne Countryman, *Executory Contracts in Bankruptcy : Part I*, 57 Minn.L.Rev. 439, 460 (1973)(commonly referred to as the Countryman Approach, "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other"); *In re RLR Celestial Homes, Inc.,* 108 B.R. 36, 44 (S.D.N.Y. 1989).

32. In fact, this Court in *RLR Celestial Homes* case stated, "[i]f the only remaining obligation on the part of the seller of real estate who holds legal title in trust for the purchaser is to deliver legal title upon the completion of the contract it is not executory because the delivery of legal title is a mere formality." *Id.* citing *Mitchell v. Sreets (In re Streets & Bears Farm Partnership),* 882 F.2d 223, 235 (Bankr. D. Utah 1982).

33. This line of reasoning was explained by the court in *In re Air Vermont, Inc.*, which dealt with the executoriness of an installment contract that paid off the purchase price of an airplane. The court explained that,

> [w]here the obligee's unexecuted performance is the transfer of title upon receipt of payment in full, such transfer, if withheld by the oblige, may be effectuated by the court. Thus, a recalcitrant obligee under an installment sales contract may not avoid the legal effect of full performance by the obligor, and the contract is therefore not an executory contract.

*In re Air Vermont, Inc.*, 47 B.R. 540, 543 (Bankr. D.Vt. 1985).

34. Holdings as these are premised on an application of the Countryman Approach, under which there must be mutually owed substantial offsetting obligations by both parties to the contract in order for it to be executory. *See In re Drahn*, 405 B.R. 470 (Bankr. N.D. Iowa 2009) (holding that a contract where the seller's only obligation on the petition date was to deliver title when installment payments were complete was not an executory contract); *In re Martinez*, 476 B.R. 627, n.2 (Bankr. D.N.M. 2012) (noting the general rule that "installment sale contracts for items of personal property are not executory contracts); *In re Johnson*, 501 F.3d 1163 (10th Cir 2007) (recognizing a line of cases which have found retail installment contracts on cars nonexecutory where the "'seller's only remaining obligation is delivery of title on receipt of full payment'" (quoting *In re Steffen,* 181 B.R. 981, 985 (Bankr. W.D.Wash. 1995)).

35. Paragraph 1 of the PSA clearly states, "Seller <u>hereby</u> sells and Buyer hereby purchases the Domain Name, and all rights and interests of any kind associated therewith and arising therefrom…." (emphasis added)

36. Paragraph 3 of the PSA clearly states "the escrow holder will manage and maintain the registration of the domain and all rights associated with the Domain Name…"

37. Separately and subsequently, Stacks was obligated to transfer the ownership registration of the domain name to the Escrow Holder (as that term is defined in the PSA), to "**hold in trust and as custodian**". (PSA, ¶2(a)) upon receipt of the initial payment in the amount of $300,000. The initial payment was made and the registration, as well as all rights associated with

12

the domain name (PSA, ¶3), was transferred to the trust. At that point in time, legal ownership rested with the Escrow Agent (with no rights in the domain name remaining with Stacks), as trustee and custodian and the Debtor, the beneficiary of such trust/escrow.

38. The PSA has been substantially performed such that no material obligations (other than the payment of money and the formality of transfer of title) remain.

39. In support of its assertion that the PSA is an executory contract, Stacks alleges in a conclusory and vague manner that there are material obligations which remain outstanding and loosely refers to the "limitations regarding the Debtor's use of the Domain Name." (PSA ¶47 and Kendrella Declaration, ¶11). However, limitations, restrictions or negative covenants do not constitute "material obligations" thereby rendering a contract executory. See *In re Schneeweiss,* 233 B.R. 28, 32 (N.D.N.Y. 1998); *In re Hirschhorn,* 156 B.R. 379 (E.D.N.Y. 1993).

40. The two negative covenants / restrictions Stack's describes as ongoing "material obligations" are not material even if they could somehow be considered obligations (which they are not). First, under ¶5 of the PSA, to the extent the Debtor misuses the domain name, the maximum penalty under ¶12 is the Debtor's inability to use the domain name until payment in full. It expressly states that "[u]nder no circumstances may Seller terminate this Agreement for purported violation of the restrictions set forth in Section 5 and under all circumstances the remedy for such violation shall be Buyers loss of the right to use the Domain Name to host content or direct the Domain Name to the website (s) and or web page (s) of buyers choosing until the purchase price has been paid in full". In other words the maximum penalty for doing something that is restricted is simply the loss of a privilege to the Debtor for a temporary period of time. As such, it cannot constitute a material breach and can therefore not be a maerial obligation.

41. Stacks also identifies negative covenants in ¶7(a)(i) of the PSA as material obligations. However, even if these were material obligations, which the Debtor does not concede, they have been satisfied once the domain transferred from Stacks to the legal control of the escrow/trust. Upon execution of the PSA, the Debtor was obligated to remit the initial $300,000 payment in order for the domain to be transferred which did not occur simultaneously. These provisions were intended to protect the Debtor during that intervening period of time. Upon transfer of the legal title to the domain, this provision was satisfied and/ or moot.

42. Moreover, while the Debtor does not dispute that the Chapter 11 does not serve to expand its rights that would not have otherwise existed outside of bankruptcy, Stacks appears to disregard the implications of Section 362 of the Bankruptcy Code in favor of payment deadlines under the PSA. Under the PSA, the Debtor is required to make certain payments, none of which became due prior to the Petition Date. The two payments which have become due since amounting to $500,000 of the total $1.4 million owed. However, any unpaid payments having come due since the Petition Date can be made at any time prior to the end of a ten (10) day cure period which doesn't even begin to run until written notice is served by Stacks, which it has not. In fact, those two missed payments can still be made "timely" under the PSA which states, "for the avoidance of doubt any payments made after their schedule date under section 2, but prior to the end of the 10 business day cure period shall be deemed timely". (PSA, ¶12).

43. As of the Petition Date, no written notice of default had been issued by Stacks (and in any event such notice is barred by the automatic stay since the filing) and as such, the ten (10) day cure period has not yet begun to run as of yet. Thus, even if payment is made to Stacks one year late (after the scheduled date under section 2 but before expiry of the cure period) such payment would be deemed timely and not late.

14

44.     The PSA is a straight forward contract of sale with a financing component. Per its express terms, the purchase price and payment terms were agreed to and as protection for both parties, the domain name was placed "in trust for the benefit of the Buyer" and "to secure[1] Sellers receipt of the unpaid balance of the Purchase Price." (PSA, ¶3(i) and (ii)). These phrases are perhaps the most important in the entire document and the Debtor submits are dispositive of these issues that the Court is being asked to decide. Thus the Debtor maintains significant rights in the contract, the trust/escrow, and is the beneficiary of the trust property.

45.     Based upon the foregoing, the Debtor submits that no material obligations remain on either side of the PSA and as such, the contract is not executory.

46.     Finally, should the Court determine that the PSA is an executory contract despite the Debtor's arguments to the contrary, the request to compel assumption or rejection is unwarranted and premature. Pursuant to Section 365(d)(2) of the Bankruptcy Code, the Debtor may assume or reject an executory contract at any time before the confirmation of a plan. While it is true that the Court is also vested with the authority in that same provision to set a deadline to assume or reject upon request, that decision is subject to the Court's discretion. *Theater Holding Corp. v. Mauro,* 681 F.2d 102, 105 (the court's discretion should be "informed by applicable law… pertinent legislative history …[and] construed in the context of the broad purposes of the entire Code.").

47.     Here, the case is but a few months old, the Debtor intends to file a Chapter 11 plan that benefits <u>all creditors and interest holders,</u> not just Stacks. As such, the Debtor requests that the request to compel assumption or rejection of the PSA be denied.

---

[1] It should be noted that Stacks failed to file a UCC-1 Financing Statement to perfect any alleged security interest in the domain name.

15

**IV. STACKS REQUEST FOR STAY RELIEF IS PREMATURE**

48. Stacks' request for stay relief is premature and improper and should be denied.

49. It seeks stay relief <u>in the event</u> that the Court rules that the PSA is an executory contract and, <u>in the event</u>, that there is a default in remitting the alleged cure payment. However, these assumptions are far too tenuous to warrant the drastic relief of stay relief.

50. Furthermore, though Section 362(d)(1) of the Bankruptcy Code is cited as the basis for stay relief, the <u>only</u> cause cited is "bad faith" which, as set forth at length herein, has not been established.

51. As such, the request for prospective stay relief should be denied.

**V. CONCLUSION**

52. This Debtor deserves a chance to reorganize and pay its debts. That is the fundamental purpose behind Chapter 11. The relief sought in Stacks' Motion will benefit only one party, Stacks, and not just with the repayment of their debt but a windfall by virtue of the recovery of the domain name worth far more than their claim. The oft quoted phrase seems appropriate here, *equity abhors forfeiture.* The Bankruptcy Court is a Court of equity and for the reasons set forth herein, the Debtor respectfully requests that this Court protect its most valuable asset from forfeiture and deny the Motion in its entirety.

Dated: Scarsdale, New York
August 2, 2019

KIRBY AISNER & CURLEY LLP
*Attorneys for the Debtor*

By: /s/ Erica R. Aisner
Erica R. Aisner
700 Post Road, Suite 237
Scarsdale, New York 10583
(914) 401-9500
eaisner@kacllp.com

16