Teitelbaum Law Group LLC
Attorneys for Stack's-Bowers Numismatics, LLC
d/b/a Stack's Bowers Galleries          Hearing Date: December 16, 2019
1 Barker Avenue                          Hearing Time: 10:00 a.m.
White Plains, New York 10610
Tel. 914.437.7670
E. Mail jteitelbaum@tblawllp.com
Jay Teitelbaum, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------
In re:                                   :    Chapter 11
                                         :    Case No: 19-22721(RDD)
HAMPSTEAD GLOBAL, LLC,                   :
            Debtor                       :
-------------------------------------------------------

**RESPONSE OF STACK'S BOWERS TO DEBTORS' FIRST AND SECOND SUPPLEMENTAL OBJECTIONS TO MOTION FOR AN ORDER, (I) DISMISSING CHAPTER 11 CASE OR CONVERTING CHAPTER 11 CASE TO CHAPTER 7; (II) COMPELLING ASSUMPTION OR REJECTION OF EXECUTORY CONTRACT; AND (III) MODIFYING THE AUTOMATIC STAY TO PERMIT THE EXERCISE OF REMEDIES OF ASSUMED OR REJECTED CONTRACTS**

1.    Stack's-Bowers Numismatics, LLC, d/b/a Stack's Bowers Galleries ("**Stacks**" or "**Movant**"), by its undersigned counsel Teitelbaum Law Group LLC, reluctantly submits this response to the Debtor's procedurally improper and substantively baseless supplemental objections a/k/a sur-replies.

**The Sur-Replies Should Not Be Considered And Should Be Stricken From the Record**

2.    On June 17, 2019 Stack's-Bowers Numismatics, LLC, d/b/a Stack's Bowers Galleries ("**Movant**"), filed its motion for an order (i) dismissing the Chapter 11 case or converting the Chapter 11 case to Chapter 7; or (ii) compelling the Debtor or Chapter 7 Trustee to assume or reject the PSA[1] and Escrow Agreement; or (iii) modifying the automatic stay to permit Movant, upon a post assumption payment default under the PSA or upon the rejection of

---
[1] Capitalized terms not otherwise defined herein are as defined in the Motion.

the PSA and Escrow Agreement, to exercise its rights and remedies under the PSA and Escrow Agreement and State Law with respect to the transfer of registration and use of the domain name coins.com (the "**Domain Name**") back to Movant; and (iv) granting Movant such other and further relief as the Court deems just and proper (ECF Docket No. 15) (the "**Motion**").

3. The Motion was scheduled for a hearing on July 12, 2019.

4. At the request of Debtor's counsel the hearing date was adjourned to August 9, 2019.

5. On August 2, 2019, the Debtor filed its objection to the Motion (ECF Docket No. 24) (the "**Objection**").

6. On August 6, 2019, Stacks filed its reply in support of the Motion as ECF Docket No. 26 (the "**Reply**").

7. On August 8, 2019 at approximately 6:30 p.m. the Debtor filed a proposed Chapter 11 Plan. (ECF Docket No. 36) (the "**Plan**").

8. As a result of the filing of the Plan, on August 9, 2019, prior to the hearing, counsel for the Debtor and Stacks agreed to try to resolve the matter consensually and jointly requested an adjournment of the hearing date on the Motion.

9. The Court provided the parties with an adjourned hearing date of October 7, 2019.

10. Nearly two months after the August 9 initial hearing date, on October 4, 2019, the Debtor filed its first Supplement to the Objection as ECF Docket No. 54 (the "**First Sur-Reply**").

11. Due to Court's schedule, prior to October 7, 2019, the Court notified the parties that the hearing date would be further adjourned to December 16, 2019.

12. Four months after the August 9 initial hearing date, on December 9, 2019, at nearly 11 p.m. the Debtor filed its Second Supplement to the Objection as ECF Docket No. 61 (the "**Second Sur-Reply**").

13. There is no record on the docket of the Debtor obtaining Court permission for the filing of either the First or Second Sur-Reply.

14. Stack's did not separately respond to the First Sur Reply as the statements were similar to those made in the Debtor's Motion for Sanctions filed on September 3, 2019 as ECF No. 41 and responded to by Stacks in its objection filed as ECF No. 46 and 49 (with exhibits).

15. However, with the Second Sur Reply, the Debtor has demonstrated a willful disregard for the rules of practice and improperly seeks to introduce evidence and arguments after pleadings have been closed. The filing of the Second Sur-Reply compels this response.

16. The rules of procedure for motion practice permit and contemplate (i) a motion, (ii) an objection and (iii) a reply. Local Rules for the Southern District of New York Rule 6.1; Local Bankruptcy Rules for the Southern District of New York Bankruptcy Court Rule 9006.1; Judge Drain's Court's Individual Rules (Form and Content of Briefs). Sur Replies are neither contemplated nor permitted (without prior leave of the court). The Court should not consider the Sur-Replies and they should be stricken from the record. *See, e.g., Biestro v. Uher,* 2019 U.S. Dist. Lexis 103541 at *6 (S.D.N.Y. 2019) ("almost two months after the calendar notice, the day before oral argument, in violation of the Local Rules, without permission of the Court, and long after a sur reply would have been due if permission had been granted to file such, Defendant submitted a sur-reply. However, because no permission to file a sur-reply was sought or given, the Court will not consider it."); *In re Fiber Optek Interconnect Corp.*, 2009 Bankr.

3

LEXIS 3040 at *9 (Bankr. S.D.N.Y. 2009) ("The Court notes that sur-replies are not permitted in federal court, and rejects [the] sur-reply as procedurally improper.").

**If The Court Permits The Sur-Replies, Stacks Is Entitled To Respond.**

17. The First Sur-Reply was purportedly based on Mr. Perzow's shock, amazement and outrage upon learning (allegedly for the first time) on August 9, 2019 about the filing of a personal fraud complaint against him in California. (ECF 54-2) (the "**California Complaint**" and the "**California Action**")). Yet it took nearly two months to file the First Sur Reply.

18. As set forth in Motion (ECF No. 15), Stacks' Reply in Support of the Motion (ECF No. 26), and Stacks' Opposition to the Debtor's Motion For Sanctions (ECF No. 46- 46.6 and 49- 49.6 filed on September 30, 2019), the allegations in the First Sur Reply are baseless and frivolous. As each of these pleadings is before the Court for the December 16 hearing, Stacks will not burden the Court with repeating in detail the arguments therein or attaching the documents as exhibits hereto, but refers to and incorporates the pleadings by reference herein and summarizes the points with citation as follows:

   a. Plans to have Mr. Perzow served with the summons and complaint in the California Action on August 9 were put in place before the Debtor filed its Plan on August 8 as a result of Mr. Perzow evading service. The process server was released prior to the August 9 hearing in light settlement discussions among counsel. ECF No. 46-7 (Spencer Decl. ¶7-11) ECF 49 (Teitelbaum Decl ¶¶2-9)

   b. As a matter of law, the automatic stay does not extend to Mr. Perzow. The California Action filed against Mr. Perzow alleges fraud and seeks money damages from Mr. Perzow. The California does not seek the recovery of the Domain Name or affect any property of the estate. Based upon the laws of the

state of California, a principal who acts outside the scope of his duties and personally benefits from his fraudulent conduct can be sued personally for such conduct. ECF No. 46, 46-7 and 49 (with attachments).

c. The transaction between the Debtor and Stacks is governed by the PSA and Escrow Agreements which expressly provide that Stacks agreed to sell the Domain Name to the Debtor for a specified purchase price to be paid in installments and that neither the registration of the Domain Name nor title or ownership of the Domain Name pass until the Purchase Price is paid in full. Motion ECF No. 15-1 @ ¶¶9. Specifically, the PSA provides at Sections 3 and 12:

> (3) For the avoidance of doubt, the Escrow Holder shall hold by private registration, the registration of the Domain Name . . . (i) in trust for the benefit of the Buyer, (ii) to secure Sellers receipt of the unpaid balance of the Purchase Price in full . . . and (iii) Buyer shall not receive the [sic] any ownership interest in the Domain Name until the Purchase Price has been paid in full and the registration has been transferred to Buyer. . . . For the avoidance of doubt, only upon the payment in full of the Purchase Price in accordance with Section 2, will the registration of the Domain Name . . . be transferred to and registered in the name of the Buyer, concurrently, by such action, all right, title and interest of any kind associated with the Domain Name . . . to the extent such rights exist, shall pass automatically to the Buyer.
>
> (12) If an Event of Default is not cured within the applicable cure period . . . at the option of Seller, this Agreement shall terminate upon notice to the Buyer and the Escrow Holder, and . . . the Escrow Holder, at the sole direction of the Seller, shall transfer and re-register the Domain Name to an account in the name of the Seller. . . .

(ECF 15-2 @ ¶3 and 12):

d. The case is a two party dispute between Stacks and the Debtor over the PSA. All other alleged creditors are insiders or hold *de-minimis* claims which the Debtor

5

cannot reasonable claim are the basis for this Chapter 11. Motion ECF No. 15-1 @ ¶¶15-17; Reply ECF No. 26 @ ¶¶6, 9-11.

    e.   There is no business to reorganize and there is no evidence that the Debtor has any ability to pay creditors in accordance with the Bankruptcy Code. This is, at best, a single asset case involving a two party dispute over the Domain Name. Motion ECF No. 15-1 @ ¶¶14; Reply ECF No. 26 @ ¶¶6, 7, 9 - 11, 13-15.

19.   In addition to restating the arguments in the First Sur Reply, in the Second Sur-Reply, the Debtor attempts to "supplement" the record with irrelevant and inadmissible arguments and evidence. Stack's response to the Second Sur-Reply is as follows.

**The PSA Is A Sale Contract: There Is No Loan Or Borrower/Lender Relationship**

20.   The PSA and Escrow Agreement expressly provide that the Domain Name was to be sold to the Debtor with an initial down payment and payments due in several installments, and that title to the Domain Name did not pass to the Buyer until the Purchase Price is paid in full. (ECF No. 15-1 ¶¶ 9 and 15-2). There is no loan transaction and Stacks is not a lender.

21.   The California Complaint alleges that the Purchase Price for the Domain Name was "for an agreed price, which would be paid over a period of time with an initial down payment" (ECF 54-2 @ ¶9) and that Stacks and the Debtor "entered into the Purchase and Sale Agreement with a minimum down payment and the balance on credit."(ECF 54-2 @ ¶12).

22.   The purchase price was not paid pursuant to the terms of the PSA and Hampstead filed for bankruptcy protection.

23.   The Debtor argues that the word "credit" in para 12 of the California Complaint is an admission that Stacks is a lender which made a loan to Hampstead for the balance of the Purchase Price. This is absurd. Pursuant to the express terms of the PSA, the transaction is a

6

sale with installment payments for the Purchase Price. There is not a single word in the PSA to indicate a loan of any kind, and there are no indicia of a loan transaction, such as a promissory note, security agreement, or an interest rate for repayment.

24.    The use of the words "on credit" in paragraph 12 of the California Complaint is a substitute for "over time" used in paragraph 9 of the California Complaint. Stacks trusted that the Purchase Price would be paid over time in accordance with the PSA. Unfortunately, in this Court of broken promises, the failure of the Debtor to make the requisite payments under the PSA and the filing of this bankruptcy case (rather than honoring the PSA) caused Stacks became a creditor of the Debtor. Bankruptcy Code §101(10) defines a creditor as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor" Under no set of facts however, did Stacks lend money to the Debtor, make a loan to the Debtor or claim a security interest in the Domain Name to secure repayment of amounts owned. Rather, Stack's retained ownership of the Domain Name and allowed the Debtor the use of the Domain Name until the Purchase Price was paid in full, at which time the Debtor would become the owner of the Domain Name.

25.    The identical issue was decided by Judge Chapman in the *Heath Global* decision detailed in Stack's objection to the Debtor's Motion for Sanctions. Judge Chapman rejected Mr. Perzow's identical argument in a virtually identical case that this type of sale transaction is a loan. ECF No. 46 at p. 12 and Exhibit D at ECF No. 49.4.

**Title To The Domain Name Has Not Been Transferred To The Debtor**

26.    At paragraph 3 of the Second Sur-Reply, the Debtor also tries to rewrite the terms of the PSA and the Escrow Agreement, arguing that title passed to the Debtor upon payment of the $300,000 initial payment because the escrow arrangement was for the exclusive benefit of

7

the Debtor. However, the Debtor conveniently quotes only 8 words from Section 3 of the PSA "(i) in trust for the benefit of the Buyer". The balance of Section 3 and the entire PSA and Escrow Agreement refute the Debtor's specious and contrived argument. The Escrow Agreement was for the protection of both parties, equally. As set forth above, Section 3 provides that the Domain Name was held in escrow "(i) in trust for the benefit of the Buyer" **and** "(ii) to secure Sellers receipt of the unpaid balance of the Purchase Price in full".

27. As set forth above, pursuant to Sections 3 and 12 of the PSA, neither title to the Domain Name nor the registration passed to the Debtor unless and until the Purchase Price was paid in full according to the terms of the PSA §2. It is undisputed that the Debtor made only the initial payment of $300,000 and defaulted in making the scheduled payments of the remainder of the Purchase Price.

28. The Escrow Agreement facilitated the arrangement under the PSA by allowing for the registration of the Domain Name in the Escrow Agent and for the Debtor to use the Domain Name pursuant to the terms of the PSA before having paid the Purchase Price in full. Upon payment in full of the Purchase Price the Escrow Agent was authorized to transfer the registration and title to the Buyer. Upon the Buyer's default in payment, the Escrow Agent was authorized to return the registration to the Seller as registered owner. The Escrow Agreement clearly provides that the Domain Name was held in escrow by the Escrow Agent as a neutral for the protection of both parties:

> The Parties acknowledge and agree that G&L is engaged under this Agreement as a neutral third party service provider. Buyer and Seller are clients of G&L solely for the purpose of administering the terms of the current escrow agreement.

(ECF 15-5 @ ¶ 1(c))

> Promptly after the Effective Date Transferor shall cause the Domain Name to be registered in the name of the Escrow Agent.

8

(ECF 15-5 @ ¶ 3(a))

       Escrow Agent shall follow such other and further terms as found in the PSA . . . .

(ECF 15-5 @ ¶ 3(c))

       Transferee will notify Escrow Agent and Transferor when the condition(s) for release and transfer of the Domain Name have been met . . . .

(ECF 15-5 @ ¶4 (a))

       Upon receipt of an Objection Notice, Escrow Agent will notify Transferee . . . and shall notify both Parties that there is a dispute regarding the release and transfer of the Domain Name . . . . After receipt of the Objection Notice, Escrow Agent will release and transfer the Domain Name only upon (i) receipt of joint written instructions from Transferor and Transferee, or (ii) an order from a court of competent jurisdiction.

(ECF 15-5 @ ¶4 (b))

    29.    As title to the Domain Name was never transferred to the Debtor and the registration is with the Escrow Agent, the Domain Name is not even property of the estate. *See In re Heath Global.* (ECF No. 46 at p. 13). Rather, the Debtor has a contractual right to use and/or purchase the Domain Name, subject to the terms of the PSA.

**The Lieberman Valuation and Rarex Business Plan Are Irrelevant And Inadmissible**

    30.    Finally, the Debtor's purported valuation of the Domain Name and a purported business plan relating to rarex.com attached to the Second Sur-Reply are irrelevant and inadmissible and should be disregarded by the Court.

    31.    Despite the Debtor's claims that the Domain Name is worth millions of dollars and that rarex.com has substantial value, there is one simple irrefutable fact as to value. In the nearly 20 months since the PSA, and the year since the purchase of rarex.com for $15,000, Mr. Perzow has not generated one cent of revenue with the Domain Name or rarex.com and has not produced one person willing to purchase either the Domain Name or rarex.com or finance the Debtor's business based upon the value of either.

9

32. Mr. Perzow's testified at the 341 meeting in this case that the Debtor never launched its business or generated any revenue prior to the Petition Date. (ECF No. 26 @ ¶9). Moreover, the operating reports filed in this case for April 2019 (ECF No. 27), May 2019 (ECF No. 28), June 2019 (ECF No. 29), July 2019 (ECF No. 30), August 2019 (ECF No. 43), September 2019 (ECF No. 56), October 2019 (ECF No. 57) and November 2019 (ECF No. 63) all reflect, $0.00 revenue, $0.00 expenditures other than the payment of legal fees from a third party and $10.00 in the Debtor's bank accounts.

33. The *only* evidence is that there is no business to reorganize and the sole purpose of this Chapter 11 is for Mr. Perzow to stiff arm creditors while he risks Stack's property (the Domain Name) for his personal potential benefit. That is not the purpose of Chapter 11.

34. The so called valuation of Mr. Lieberman attached to the Second Sur-Reply is laughable. Other than Mr. Lieberman's background, there is not a scintilla of objective evidence of anything. The valuation can be summarized as "I have experience, so just take my word for it." Indeed, in coming up with his $4-6 million range, Mr. Lieberman identifies three valuation approaches; however, he (i) rejects the cost basis approach for no stated reason other than the obvious that the cost of the Domain Name under the PSA was a fraction of even the low end of his valuation; (ii) rejects the income approach for no stated reason other than the obvious that the Domain name has not generated one cent of revenue, so no multiple would create value; and (iii) adopts a Market or Sale Approach which he admits has been rejected by numerous courts when applied to domain names as inherently unreliable, "a stab in the dark" and akin to a "lottery ticket". In support of his lottery ticket valuation, Mr. Lieberman points to transactions in the crypto currency realm and then "assumes that coins.com is representative" of these transactions. There is no analysis to support the assumption. Rather, Mr. Lieberman puts Mr.

10

Perzow and coins.com on the same playing field with Facebook and its attempt to grab a piece of the bitcoin market with its libra platform. Again there is no analysis for the assumption and one could suspect that Facebook might take issue with being placed in the same company as the Debtor.

35. As for the rarex.com business plan, it is similarly irrelevant and inadmissible hearsay- -not to mention pure speculation and fantasy. The plan is undated and un-authored. It is nothing more than a sales pitch prepared by an undisclosed party at an undisclosed time. In contrast to the "business plan", the fact is that the Debtor has not launched any business or generated one cent of revenue or produced a buyer or lender in the year since it acquired rarex.com for $15,000. The "business plan" is simply not worth the cost of the paper it is printed on.

36. Incredibly, the Debtor also argues that the potential value for rarex.com is evidenced by the bald statement that Stacks understands the value of rarex.com and hoped to participate in the rarex venture with Mr. Perzow. (ECF 61 at page 5). The sole basis for this statement is an email from Mr. Kendrella to Mr. Perzow or Mr. Gati dated August 29, 2018 attached to the Second Sur Reply. The email reads in its entirety:

> *"Found this article interesting: https://techcrunch.com/2018/08/28/security-tokens-will-be-coming-to-an-exchange-near-you/. You may enjoy it if you have not seen it."*

37. The article was one person's opinion piece about the potential for "security tokens" defined as "blockchain based representations of value that is subject to regulation under securities law". Whether or how this article is relevant to the Debtor is unclear at best.[2]

---

[2] The article is hearsay, irrelevant and not admissible for any purpose. The article refers to giants in the cryptocurrency field and does not mention the Debtor, coins.com or rarex.com.

11

38.     The email evidences *only* that Mr. Kendrella forwarded an article which he thought might be of interest to Mr. Perzow. PERIOD FULL STOP. The email is neither relevant nor proof of anything, and merits no further response.

### **Conclusion**

39.     Stacks seeks dismissal of this case or the appointment of a trustee to sell the Debtor's assets[3] because there is no viable business and no reorganization in prospect. Because Stacks is the only disinterested creditor with any skin in the game, it is alone in its efforts to oppose Mr. Perzow's attempt to rewrite the PSA, indefinitely delay payment to Stacks and other creditors and speculate on the potential upside value of the Domain Name for his personal benefit as the sole owner of the Debtor.

40.     The Debtor's repeated refrain that Stack's is looking to recover the Domain Name out of seller's remorse is a red herring. It is Mr. Perzow who is improperly using the Chapter 11 process for his personal gain rather than to restructure a viable business and treat creditors fairly. Stacks wants and is entitled to be paid the Purchase Price for the Domain Name. If the value of the Domain Name is as the Debtor alleges, Stacks will cooperate with a trustee to sell it and there will be more than ample proceeds to pay creditors in full.

41.     The fact remains that there is no operating business and dismissal or the appointment of a Chapter 7 trustee to sell the Domain Name and the rarex.com name is the most efficient use of this Court's resources and the time and money of creditors.

---

[3] In this context, assets means the Debtor's rights, if any, as a contract vendee under the PSA as the Debtor is not the owner of the Domain Name.

**WHEREFORE,** Movant respectfully requests that this Court (i) disregard and strike the First and Second Sur-Reply, (ii) grant the Motion; and (iii) grant Movant such other and further relief as the Court deems just and proper.

Dated: December 12, 2019

**Teitelbaum Law Group LLC**

By: __/s Jay Teitelbaum_____
Attorneys for Stack's Bowers Numismatics,
LLC d/b/a Stack's Bowers Galleries
1 Barker Avenue
White Plains, New York 10610
Tel. 914.437.7670
E. Mail jteitelbaum@tblawllp.com