**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| HAMPSTEAD GLOBAL, LLC, | Case No. 19-22721-rdd |
| Debtor. | **DECLARATION OF ADAM PERZOW** |

I, Adam Perzow hereby declare:

1.      I am the sole member and manager of the above-named Debtor. I submit this declaration in opposition to the application for allowance of compensation of Kirby Aisner & Curley LLP ("KAC").

2.      The Court should not decide the subject fee dispute for several reasons.  First, the Debtor submits a $50,000 lodestar adjustment is warranted, for reasons set forth below, and desires to arbitrate the subject fee dispute of $50,000 pursuant to 22 NYCRR Part 137.[1]

3.      Second, KAC agreed not to apply for allowance of compensation in the event of dismissal of this action, as is contemplated by the Settlement Agreement as to which the Debtor sought approval by motion being heard at the same time as the fee application.  Specifically, the parties' engagement agreement, a true copy of which is attached as Exhibit A, provides: "**Except in the event of conversion or dismissal**, any fees payable in excess of the applied retainer and ordinary expenses incurred are payable upon award by the bankruptcy court." As such, the Debtor desires to arbitrate the subject fee dispute of $50,000 pursuant to 22 NYCRR Part 137.

4.      As to the above-proposed lodestar adjustment, the Debtor submits that it is warranted, because KAC did not do that for which it was engaged, violated professional conduct

---

[1] Of the total $58,782.50 being requested by KAC, the amount exceeding the $50,000 being challenged by Debtor, comes to $8,782.50, which can be provided to KAC in the form of retention of the $5,000 retainer previously paid to KAC from myself, with the remaining $3,782.50 deemed as an uncontested amount owed.

rules in the process, did not perform basic tasks within a reasonable amount of time and delayed resolution of this case in a manner that prejudiced the Debtor, and also cost the Debtor opportunity, time and expense, all as described below.

5.    At the outset, the Debtor's goal was simple, and obvious: confirm a plan that provided for payment of allowed, unsecured claims in full, over as long a repayment period permitted, and with the bare minimum interest required, so as to afford the Debtor breathing space to monetize the Coins.com URL either through implementation of a business plan that had been developed, together with assistance from Ari Gati, an outside advisor; or alternatively, through a sale.[2]

6.    KAC was engaged for the express purpose of moving this case forward, because despite having been engaged to represent a chapter 11 debtor, former bankruptcy counsel Law Offices of Charles A. Higgs (and later as special counsel) was not meeting timelines early in the case, was disorganized, and the Debtor wanted to better demonstrate proactivity in this chapter 11 case.

7.    In May 2019, I commenced discussions with KAC regarding replacing Mr. Higgs. In connection with those discussions, I expressed to KAC that if it were to represent the Debtor, I wished to propose a plan within the first thirty days following its engagement, and also file an accompanying disclosure statement so as to march toward confirmation. KAC assured me this

---

[2]    After I learned Stack's Bowers had sued me personally for fraud in California state court, a secondary goal was added; namely, preserving/prosecuting claims against Stack's Bowers, which I have also agreed to release personally pursuant to the Settlement Agreement.

I understand the bare minimum interest required by the Bankruptcy Code would have been "*Till*" interest, as all parties would agree (I think) that there is not an efficient market for DIP/Exit loans in small business cases to debtors whose principal asset is a domain name held in escrow. At the commencement of this case the prime rate was around five percent; it is now three-and-a-quarter percent.

would happen. I also made clear to the Debtor that the Debtor did not have cash—a fact made clear by the Debtor's schedules—and that I or my father would guarantee payment of allowed fees and costs.

8.      KAC agreed to that arrangement, and I was specifically advised payment need only be made to the extent the Debtor had available funds (i.e. upon the occurrence of a financing or other monetization event in respect of the Coins.com URL), or KAC would otherwise pursue the guarantor as its remedy, as set forth in the e-mail correspondence attached as <u>Exhibit B</u>.

9.      In addition, in connection with the firm's engagement, I negotiated the above-quoted language (see Paragraph 3, above) precluding a fee application in the event of conversion or dismissal. This term was not part of KAC's standard engagement letter, and was a material part of our agreement (which does not include an "entire agreement" clause). Our e-mails made clear the intention was for KAC to seek remedies under nonbankruptcy law if this case were converted or dismissed, as set forth in <u>Exhibit B</u>.

10.      KAC assured me it would file a plan and disclosure statement within the subject thirty-day period; and at the very maximum before the hearing on the motion to dismiss which took place August 9, 2019. Our collective intention was to show the Court that this case should not be dismissed because the Debtor had a viable proposal for paying creditors in full. I specifically urged and requested of KAC for many weeks prior to the August hearing to make sure that the plan and disclosure statement would be ready to file.

11.      Mr. Gati and myself had a number of discussions with KAC in connection with formulation of the plan. We requested that the plan provide for a repayment period of three to five years.

12.	KAC pushed back and claimed that the Court would not confirm a plan with that repayment term and instructed us that a twelve to eighteen-month repayment period was the maximum achievable.

13.	KAC was aware of the value of the Coins.com URL—although it completely abdicated its responsibility to advise as to an admissible expert report, under Federal Rule of Evidence, Article VII (see Document #61-1). I have since spoken with several bankruptcy attorneys—not just the one the Debtor employed or proposed to employ in this chapter 11 case—and understand our proposed three to five year repayment period was permitted under Bankruptcy Code section 1129, even over Stack's Bowers objection.

14.	I believe KAC deliberately tried to propose a shortened timeframe so as to improve the likelihood of achieving a fast and easy compromise with Stack's Bowers, and avoid having to do the work associated with confirming a plan.[3]

15.	An additional concern was when I found out that KAC had an oddly close relationship with Jay Teitelbaum, counsel to Stack's Bowers, which I was not made aware of ahead of engaging KAC. As Dawn Kirby told me after we engaged, Mr. Teitelbaum helped her set up their new law firm, and Ms. Kirby joined Mr. Teitelbaum in meeting with Armand Assante as a favor, a well-known actor, for a movie financing deal they would be pursuing. Ms. Kirby was also intimately aware of curious details concerning Mr. Teitelbaum, including how much money he desired to save before retiring to his vacation home in Sarasota, Florida. In other words, it seemed

---

[3]	The plan and disclosure statement filed by KAC on January 24, 2020 (Document #68-69) were 30 and 42 pages each, even though I since learned there is an Official Form of both that is materially shorter. KAC never asked for authorization to solicit the plan. Also, this plan and the prior one filed by KAC on August 8, 2019 (Document #36) were marked "*/s/ Adam Perzow*" on the last page, although upon information and belief KAC never asked me to sign the plan and I do not believe I ever did.

as if they were quite close, and far beyond a typical friendly lawyer to lawyer relationship. I believe their professional/social relationship contributed to Ms. Kirby's unwillingness to propose the plan the Debtor requested, nor to be earnestly pursuing the Debtors full rights and options under the Bankruptcy Code. In my opinion, she should have been required to disclose the full nature of her connection to Mr. Teitelbaum to me prior to her agreeing to undertake the engagement, and also under Rule 2016.

16.    KAC's failure to advise me as to the ability to obtain more time, and advising me there was no choice but to propose an eighteen month plan (and thereafter delaying and ultimately not filing an amended plan as the Debtor requested), amounted to a violation of Professional Conduct Rule 1.1(c): "A lawyer shall not intentionally: (1) fail to seek the objectives of the client through reasonably available means permitted by law and these Rules."

17.    That KAC only filed a form, chapter 11 plan it had no intention of soliciting, the day before the hearing on the motion to dismiss, and absent a disclosure statement, was highly concerning. Of course, the Court is aware of its comments at the hearing that a disclosure statement should be filed promptly thereafter. E-mails with Erica Aisner about this are set forth in Exhibit C.

18.    Following the hearing, Mr. Gati and myself pleaded with KAC to get a disclosure statement on file, first to Erica Aisner, and then when that did not yield activity with Ms. Kirby, who took over the case in mid-September 2019.[4]

---

[4]    The reason for the switch, is that Ms. Aisner advised Mr. Teitelbaum that the Debtor would not take any action in response to Stack's Bowers' commencement of the California action. I vehemently disagreed with that position; and insisted on the switch on learning that Ms. Aisner communicated as much to Mr. Teitelbaum without my authorization. Ms. Aisner tried to convince me otherwise, so as to protect their friend Mr. Teitelbaum from "looking bad" in front of their client, which I found bizarre.

19.     From then on, Mr. Gati and myself educated ourselves about the Debtor's rights in bankruptcy and found out that a longer-duration plan could be confirmed, so long as Stack's Bowers was paid the present value of its claim over the duration of the multi-year repayment period (i.e., the amount of its claim plus "cramdown interest" which I was more than happy to escrow) and we submitted admissible evidence that Stack's Bowers was protected given the value of the Coins.com URL.

20.     After educating ourselves, Mr. Gati and I spoke with Ms. Kirby on several occasions in September 2019 and October 2019 and came to what we thought was a clear understanding; namely, that the Debtor would file a revised plan, together with a disclosure statement, proposing a three year repayment period.  Ms. Kirby assured us that said documents would be filed promptly, as set forth in the e-mail correspondence attached as Exhibit D.

21.     Despite our repeated urging from September until early December, Ms. Kirby went long periods of time without responding to us, even after giving us assurances that the plan was being worked on and the disclosure statement was done and almost ready for circulation.  The process was highly concerning, and I felt we were regularly getting the "run-around", and that nothing was being done to "move" this case other than wait for Stack's Bowers to make a concession, which of course it had no reason to do KAC not having so much as asked to solicit a plan.  I found this astonishing given the deadlines under the Bankruptcy Code for concluding small business cases.

22.     Having grown frustrated with the situation and lack of action, in late September, I reached out to U.S. Trustee Andrew Velez-Rivera to advise Stack's Bowers' motion to dismiss contained statements contradicted by allegations in its California complaint.  Mr. Rivera advised me that he preferred to communicate with attorneys' present (as to which I told him I had no issue),

and he then e-mailed Ms. Kirby to advise as to my communication and that nothing substantive had been discussed. Ms. Kirby responded to me with an irate email, attached as <u>Exhibit E</u>, claiming a breakdown in the relationship that warranted her withdrawal.[5]

23. From the beginning of October through end of November 2019, Mr. Gati and myself regularly asked Ms. Kirby about when she expected to get the amended plan and disclosure statement on file. On the rare occasion an answer would come it would be vague and unclear, and in hindsight it is obvious the responses were solely meant to placate, and that there was no intention to seek a three-year plan as had been promised. See e-mail correspondence attached as <u>Exhibit F</u>.

24. In early December, and with another hearing scheduled for the sixteenth of that month, after months of back and forth, we pleaded once again with Ms. Kirby to get an amended plan and disclosure statement on file that reflected the three year repayment period. In response, Ms. Kirby finally advised us that she would <u>not</u> make the subject filings. The asserted justification was that the California action was outstanding. As a reminder to the Court, the California action asserted a single cause of action against <u>me</u> (not the Debtor) for fraud in the inducement in respect of the Purchase and Sale Agreement with Stack's Bowers. The subject e-mail correspondence is attached as <u>Exhibit G</u>.

25. Mr. Gati and myself, and the Debtor's California counsel Michael Bowse found this response perplexing and disturbing, as it confirmed what we had been fearing. We were completely demoralized by the inactivity which followed months of promises and assurances from Ms. Kirby, only to be met with a total lack of commitment to getting the amended plan and disclosure statement filed on time prior to the December hearing date. It is my belief that the reason

---

[5] Based on her conduct in the coming months and subsequent statements, discussed below, I believe she was simply looking for a way out of this case.

for this was due to the relationship with Mr. Teitelbaum and also due to a complete unwillingness to proceed with a contested confirmation.

26.     Due to the non-filing of the amended plan and disclosure statement, and on the new terms, the hearing in front of the court cast the Debtor in a poor light, and without asserting the actual terms it wished to seek. It portrayed the wrong intent of the Debtor to the other side, and the wrong intent and goals of the Debtor to the court. Due to the fact that the original incorrect plan was the only one on file which depicted an eighteen month timeframe, the result at, and after the hearing, ended up being that the Debtor was now anchored in a terrible position and was resolved to talking to Stack's Bowers about a timeframe of a mere nine months.

27.     Following the December hearing, and Messrs. Gati, Bowse and myself feeling incredibly frustrated due to Ms. Kirby's failure to file an amended plan and disclosure statement prior to that December hearing, in early January, I pressed her to provide a draft of the same in whatever shape it was in.   Ms. Kirby refused to oblige, despite having claimed in November that she had been working tirelessly on it, and that it was complete or near complete. See email attached as exhibit H.

28.     Despite feeling demoralized about the Debtors drastically weakened position, I remained resolute on complying with all deadlines. As the 300-day deadline under Bankruptcy Code section 1121(e) was fast approaching (which deadline, by the way, Ms. Kirby told me about for the first time only in December), I was concerned there was a lack of disclosure statement on file, nor amended plan, and I urged Ms. Kirby to file one to remain compliant.  Ms. Kirby advised me that it was not necessary because we had one on file from August without a disclosure statement and that it satisfied the 300-day rule. After urging her to do so, Ms. Kirby filed a

second "placeholder" plan and "placeholder" disclosure statement after mine and Mr. Bowse's urging.

29.     From and after January 2020, after everything that he had seen, Mr. Bowse voiced concern to Mr. Gati and myself about Ms. Kirby's behavior and professionalism, and that she can no longer be trusted to fight for the Debtors best interests.    We had all lost confidence in Ms. Kirby, and so, Mr. Bowse who is not a bankruptcy lawyer, had to get involved in bringing this case to a conclusion. <u>This is why the Court appeared perplexed on various status calls on why the bankruptcy lawyers were not speaking to each other directly</u>.

30.     As an example of Ms. Kirby's odd behavior, in a March e-mail, Ms. Kirby accused Mr. Gati of being "hostile" in what was a routine email attached as <u>Exhibit I</u>.

31.     In April 2020, when Mr. Teitelbaum submitted a letter to the Court via the chambers e-mail address, there was (as usual) no urgency as to submitting a response.   The Debtor's team accordingly took it upon itself to fashion a response; and after several requests for Ms. Kirby to respond, Mr. Gati e-mailed her "Dawn, please don't go radio silent on us … again. Need assurance you're on this and ready to go.  Stay safe, Ari."  Not having heard back from her within a reasonable window, we called her and wrote a simple follow up e-mail "we just tried to call you but no answer" to which she responded:  "I realize we are all home, but you sent me a draft letter on Friday night. I am not available to you on Saturday night or Sunday morning at your convenience, and without any prior scheduled appointment, as your emails suggest you believe. Furthermore, the nasty tone of your Saturday night email is not alright with me, and is not the first time. At this point its obvious we are not working well together. I will be filing a motion to withdraw as counsel to the debtor, which I believe is in all our best interests. Attached is the letter with minor revisions. Please respond with your authorization for me to send."

32.     I responded stating "yes, please send the letter and file on the docket ASAP. We would appreciate that. On another note, we know that you want out of the case and have wanted that for a long time, this has been no secret to anyone… but specifically… which email that I sent do you believe has a 'nasty tone'? I suggest we all get on a call to talk". She did not respond, apparently recognizing that there was no "nasty" e-mail to point to. The only email that was sent on Saturday night was the one from Mr. Gati above asking her to not go "radio silent yet again" which we had become accustomed to.  The e-mail thread is attached as <u>Exhibit J</u>.

33.     Until the Debtor brought Duane Morris in, in March 2020, Stack's Bowers' position was that it would only agree to a nine-month repayment period.

34.     KAC's representation that "[t]he benefit of [KAC's] year-long efforts for the Debtor is evidenced by the fact that only 6 days after the Amini LLC retention application was filed … a motion seeking a fully executed settlement agreement between the Debtor and Stacks was filed" is patently false.  The settlement terms Stack's Bowers was willing to agree to did not improve until after the hiring of Jeffrey Kahane of Duane Morris, a very seasoned bankruptcy attorney, who was now able to "oversee" Dawn and her behavior, as well as the other litigators hired at Duane Morris under that engagement.   After Mr. Kahane got involved in the case, he was copied on all email correspondence, took the lead on communication with the other side, spoke with Dawn, and was made aware of Mrs. Kirby's behavior, and he acknowledged to us on several occasions he was absolutely perplexed of her handling of the bankruptcy case and her behavior in general. He said he had never seen anything quite like it in his many years as a bankruptcy practitioner. Once Mr. Kahane got involved in the case, the entire complexion of the case changed, and for the better.

35.     After some time, and in early June, the initial e-mail negotiations that took place between Mr. Kahane and Stack's Bowers concluded, and the Debtor made good on its threat to propose a plan that provided it with only de minimis cramdown interest and an extended repayment period (Document #81),[6] we reached a settlement providing for a four-year repayment period.

36.     Significantly, Dawn could have proposed a near-identical plan at the outset of her engagement, simply changing the applicable interest rate to that applicable under section 1129(b)(2)(B).  I do not understand why she did not, as proposing such plan was the very purpose of KAC's engagement.

37.     If not for Messrs. Kahane, Bowse and Chubak, the Debtor would be in a highly precarious position due to KAC, which cost the Debtor time, opportunity and legal expense of other counsel that had to be brought in to do what KAC should and could have done a year ago upon its initial engagement.  Without the help of these other lawyers, the settlement achieved would have literally been impossible. I state this not to disparage Ms. Kirby, but as an honest recounting of what actually transpired.

38.     In the event the Court declines to grant our request to arbitrate under Part 137, the Court should make a material adjustment to the lodestar.  Bankruptcy Code section 330(a)(3)(C) provides for an adjustment where, as here, services did not help conclude the subject case; and section 330(a)(3)(D) provides for an adjustment where the subject services were not performed

---

[6]     In the fee application, KAC states that it was prepared to file an amended petition.  Whether or not true, significantly Ms. Kirby does not state that she was willing to file further amended plan, or that she would have agreed to "stretch" the repayment period as to administrative expenses over the repayment period provided under the plan, as permitted by Bankruptcy Code section 1191(e). Indeed, Ms. Kirby never advised me as to the "special rule" under section 1191, despite the fact that administrative expenses had mounted due to her own delay.

within a reasonable amount of time, which of course is not warranted in this quite simple, chapter 11 case.

[Remainder of Page Left Blank]

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 30, 2020.

Adam Perzow